**STATE of Texas, Appellant,**

v.

**WILLIAMS & METTLE CO., a Texas Corporation, Appellee.**

**No. 3–93–697–CV.**

Court of Appeals of Texas, Austin.

Nov. 9, 1994.

Rehearing Overruled Dec. 21, 1994.

Dan Morales, Atty. Gen., David Randell, Asst. Atty. Gen., Austin, for appellant.

Steven E. Halpin, Houston, for appellee.

Before POWERS, JONES and B.A. SMITH, JJ.

BEA ANN SMITH, Justice.

The State of Texas sued Williams & Mettle Co. (the "Company") to recover unemployment taxes for 1987, 1988, 1989 and for three quarters of 1991. The trial court rendered a take-nothing judgment against the State, dis-missing for lack of jurisdiction the suit seeking contributions for 1987 through 1989 and finding that the Company had credits for 1991 which equaled or exceeded the contributions claimed by the State. We will reverse the trial court's judgment.

## STATUTORY SCHEME

This appeal causes us to examine the statutory scheme requiring employers to pay contributions to the state unemployment compensation fund under the Texas Unemployment Compensation Act (the "Act"). *See* Tex.Lab.Code Ann. §§ 201.001–217.006 (West 1994) (hereafter "Labor Code"). The percentage of total wages that an employer must contribute to the state unemployment compensation fund is calculated by applying a statutory formula to the employer's compensation experience. *See Texas Employment Comm'n v. Manpower, Inc.*, 795 S.W.2d 261, 263 n. 1 (Tex.App.—Austin 1990, writ denied). Compensation experience is a body of information that includes the frequency of claims filed by former employees, mergers by the employer with other companies, and the employer's entry into other industries. *See* Labor Code §§ 204.001–.086. The experience tax rating is adjusted annually based on changes in this compensation experience. *Id.* §§ 204.041, .047.

Until an employer has earned at least four consecutive calendar quarters of compensation experience, it must contribute to the fund under a median rate of 2.7 percent of all wages paid, or at the rate established for a particular industry, whichever is greater.[1] *Id.* §§ 204.004, .006. Employers apparently found this initial contribution rate of 2.7 percent so attractive that they began to acquire new businesses for the sole purpose of claiming the lower rate. The legislature closed this loophole by adopting a mandatory transfer provision: When an "employing unit" acquired and continued to operate all of the organization, trade, or business of an "employer," the successor employing unit ac-

---

1. The Texas Employment Commission ("TEC") establishes average contribution rates for each particular industry listed in the Standard Industrial Classification Manual prepared by the United States Office of Management and Budget.

These rates are determined on an industry-by-industry basis by averaging the contribution rates paid by employers in each industry over the preceding fiscal year ending September 30. Labor Code §§ 204.001, .005.

quired the predecessor employer's compensation experience rather than enjoying the "new employer" rate of 2.7 percent.[2] *See* Act of May 17, 1985, 69th Leg., R.S., ch. 353, §§ 1, 2, 1985 Tex.Gen.Laws 1421, 1421–23 (Tex.Rev.Civ.Stat.Ann. art. 5221b–5(c)(7)(A), since amended, repealed and codified at Tex. Lab.Code Ann. § 204.083 (West 1994)) (hereafter "former article 5221b–5(c)(7)(A)"). Because this scheme worked a hardship on bona fide acquisitions, the provision was amended in 1989 to confine its application to transfers involving any relationship between shareholders, officers, or other interest-holders of the acquiring business and the selling business. *See* Act of May 28, 1989, 71st Leg., R.S., ch. 436, § 1, 1989 Tex.Gen.Laws 1583, 1584 (Tex.Rev.Civ.Stat.Ann. art. 5221b–5(c)(7)(A)(iii), since repealed and codified at Tex.Lab.Code Ann. § 204.083 (West 1994)) (hereafter "1989 amendment"); *see also Texas Employment Comm'n v. Ben Hogan Co.,* 854 S.W.2d 292, 293 (Tex.App.—Austin 1993, no writ).

## THE CONTROVERSY

The Company acquired Wire Screens, Inc. on December 31, 1986. Relying on former article 5221b–5(c)(7)(A), the State transferred Wire Screens' experience tax rate of 6.27 percent to the Company for the years 1987 through 1989. Arguing that it had not acquired all of the predecessor, or alternatively that the mandatory transfer provision was unlawful, the Company refused to make contributions at the rate assessed by the TEC. The State brought this suit to collect the balance due for the three years in question. The State also sought contributions it alleged were due for the first, third and fourth quarters of 1991. The Company answered by filing a plea to the jurisdiction, alleging that when the legislature enacted the 1989 amendment without including a savings clause, it effectively repealed the mandatory transfer provision for all prior years, depriving the court of subject-matter jurisdiction. Additionally, the Company claimed

sufficient credits to offset any contributions due for 1991. The trial court granted the plea to the jurisdiction for the tax years 1987 through 1989, and after hearing evidence, found that the Company's credits equaled or exceeded the contributions due for the three quarters in 1991.

The State brings three points of error, complaining that the trial court erred: (1) in dismissing its cause of action for 1987 through 1989 for lack of subject-matter jurisdiction; (2) in finding good cause to admit the testimony of an undisclosed witness; and (3) in finding that no taxes were due for 1991 because the evidence is legally and factually insufficient to establish an offset. In a cross-point the Company appeals the trial court's denial of attorney's fees pursuant to article 105.003 of the Texas Civil Practice & Remedies Code based on the State's having brought a frivolous and unreasonable lawsuit.

## ANALYSIS

The present controversy requires us to determine whether the 1989 amendment, restricting the mandatory transfer provision to transactions involving related parties, repealed the transfer provision's applicability in prior tax years. The Company argues that any tax liability created in prior years by former article 5221b–5(c)(7)(A) was eliminated when the legislature amended the transfer provision without a savings clause. The State responds that the unemployment tax contributions due under the mandatory transfer provision became a final, matured liability either when the wages were paid or when the contributions for each quarter became due. The State further argues that the 1989 amendment to the mandatory transfer provision cannot operate to retroactively extinguish the Company's employment tax obligations for 1987 through 1989 because our state constitution removes the legislature's power to extinguish any individual or corporate indebtedness to the state except delin-

---

**2.** The Act defines "employing unit" as "any individual or type of organization, including but not limited to ... [a] corporation" that employs at least one individual performing services within Texas. Labor Code § 201.011. The Act's defini- tion of "employer" includes "an individual or employing unit that acquires the organization, trade, or business of another, or substantially all of the assets thereof, of another ... employer...." *Id.* § 201.022.

quent taxes that have been due for a period of ten years. *See* Tex. Const. art. III, § 55.

We do not reach this constitutional question because, as we interpret the statute, the legislature clearly did not intend the 1989 amendment to be applied retroactively. Conventional methods of statutory construction, the interpretation of the agency charged with interpreting the statute, and sound public policy all support the State's argument that tax obligations accruing during the effective dates of the mandatory transfer provisions[3] were not extinguished by the 1989 amendment restricting that provision to transfers between related parties. *See generally Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382, 384 (Tex.1982) (court must construe statute to give effect to legislative intent); *Manpower,* 795 S.W.2d at 265 (great weight given to agency's interpretation if statute's meaning is unclear, in doubt, or ambiguous).

To reach this conclusion we need look no further than the 1989 amendment itself. Part of the 1989 amendment, former article 5221b–5(c)(7)(A)(iv), permits businesses adversely affected by the former mandatory transfer provision to apply to the TEC in writing between September 1 and December 31, 1989, to have their experience rates recalculated for 1990 in light of the amendment. Businesses that failed to apply for relief within this three-month window would continue to be taxed at the former higher rates.[4] Significantly, the amendment does not provide for a refund or an adjustment to adversely affected businesses in any year before 1990.

In light of this clear evidence that the legislature did not intend to extinguish all obligations created by the mandatory transfer provision in its original form, we are not persuaded by the Company's argument that the lack of a savings clause in the 1989 amendment nevertheless mandates this result.[5] If the legislature had wanted to grant retroactive relief to every business that had been assessed the higher experience tax rating from the mandatory transfer provision's effective date of June 5, 1985, it could have done so. Instead, it granted prospective relief to those businesses that applied for an adjustment in writing within a short three-month grace period. The 1989 amendment prospectively removed the mandatory transfer provision's application to bona fide, arm's-length transfers; it did not retroactively extinguish any obligation of adversely affected businesses. Nothing in the amendment removed the State's right to collect those obligations which had already accrued under the former version of the Act. We note that the Company did not make contributions at the rate it was assessed and then seek a refund; rather it paid the lower 2.7 percent rate it thought it was entitled to as a new employer. Were we to interpret the 1989 amendment as the Company urges, we would inflict an inexplicable penalty on those businesses which dutifully paid the higher rates assessed under the mandatory transfer provision and reward those employers who recalcitrantly refused to pay their assessed rates. The clear meaning of the amendment and sound public policy militate against such an interpretation.

We hold that the trial court erred in dismissing the State's cause of action for contributions due in the years 1987 through 1989. Having sustained the State's first point of error, we need not reach its other points affecting its claim for contributions in the first, third and fourth quarters of 1991. The State argues that any credit claimed by the

---

3. Former article 5221b–5(c)(7)(A) was effective June 10, 1985. The 1989 amendment, former article 5221b–5(c)(7)(A)(iii), which restricted its application, became effective September 1, 1989.

4. In fact, the Company applied for and received an adjusted experience tax rating for 1990 relying on former article 5221b–5(c)(7)(A)(iv).

5. The cases to which the Company refers us are inapposite. These cases hold that pending suits brought pursuant to a statute which creates a

cause of action are stopped when the statute is repealed or amended without a savings clause. *See, e.g., Knight,* 627 S.W.2d at 384; *Dickson v. Navarro County Levee Improvement Dist. No. 3,* 135 Tex. 95, 139 S.W.2d 257, 259–60 (1940). The mandatory transfer provision does not create the State's right to collect matured tax obligations; it simply establishes the rate for calculation of future unemployment taxes. The statute-of-limitations cases cited by the Company are distinguishable for the same reason.

**166**

Company as an offset to contributions due in 1991 was "surplus credit."[6] The evidence introduced by the Company likewise suggests that some or all of its claimed credits were surplus credit. By statute an employer can use a surplus credit only if it is not delinquent in paying employment taxes; it may not apply the credit against delinquent contributions. Labor Code § 204.065(c). The Company also argues that even if the mandatory transfer provision and the Company's liability were not extinguished by the 1989 amendment, the transfer provision does not apply to this partial acquisition. By dismissing the State's cause of action for lack of subject-matter jurisdiction, the trial court did not reach this question; there has been no judicial determination of the Company's delinquency for 1987 through 1989. The outcome of the State's claims for the prior years will affect which credits, if any, the Company is entitled to claim as an offset against contributions due in 1991.

Finally, our holding obviates review of the Company's cross-point that the State's cause of action was frivolous. The cross-point is overruled.

## CONCLUSION

Because we conclude that the trial court erred in dismissing the State's cause of action for contributions due in 1987 through 1989, we reverse the trial court's judgment. Because the trial court must determine the amounts owed for 1987 through 1989 and the availability of any surplus credit as an offset in 1991 based upon the merits of the State's claims for the earlier years, we remand the cause to the trial court for further proceedings.

---

**6.** If *total employer* contributions to the unemployment fund exceed the statutory "ceiling" for the fund in a given year, a surplus credit is issued to experience-rated employers for the following year. *See* Labor Code § 204.065.